## Chesapeake & Ohio Railway Company v. Peed.

(Decided November 11, 1913).

### Appeal from Shelby Circuit Court.

1. Railroads—Railroad Companies Cannot Contract So As to Prejudice Rights of the Public.—Railroad companies cannot enter into traffic contracts with each other that will disable either of them from performing service to the public which except for the contract would be performed. They cannot enter into contracts with

each other that will impair the ability of either of them to furnish to the public such service as either of them might be required to and would furnish except for the contract.

2. **Railroads—Contracts Between Railroads—Construction of When Rights of Public are Affected.**—In the construction of traffic contracts between railroad companies that affect the rights of the public that construction will be adopted that is most favorable to the interests of the public, if the contract is fairly susceptible of two constructions.

3. **Railroads—Contracts Between Railroads That Impair Ability to Serve Public Forbidden by Statute—Construction of Section 792 of the Kentucky Statutes.**—Section 792 of the Kentucky Statutes provides in substance that when two railroad companies use the same line of roadway in the operation of their trains, they shall furnish reasonable and proper facilities for receiving, forwarding and delivering passengers and property, and that all contracts made between them that interfere with the performance of this duty shall be void. Therefore, where two railroad companies have entered into a traffic contract that prohibits one of them from furnishing reasonable and proper facilities to serve the public along the road operated jointly by them, so much of the contract is in violation of the statute and void.

4. **Railroads—Traffic Contracts Between Railroads—Construction of Contract.**—The contemporaneous construction given to a traffic contract by the railroad companies will not be controlling upon a member of the public whose rights are affected by the contract, although such construction might be binding between the parties to it.

5. **Railroads—Unlawful Traffic Contract Between Railroads—Facts Stated.**—The C. & O. and the L. & N. entered into a contract by which the trains of the C. & O. were to run over the track of the L. & N. between Lexington and Louisville but the contract as construed by the companies prohibited the C. & O. from delivering any freight between Lexington and Louisville that was received by it East of Lexington, and under this construction it was compelled to deliver such freight to the L. & N. at Lexington for delivery at points between Lexington and Louisville. Acting under this contract the C. & O. received a carload of stock at Mt. Sterling for shipment to Shelbyville, a point between Lexington and Louisville, through which the train carrying the stock from Mt. Sterling to Lexington passed a few hours after leaving Mt. Sterling, but the stock was delivered to the L. & N. at Lexington and carried by it to Shelbyville in a roundabout way and in such carriage it was damaged. Held, that the C. & O. was liable for damage done to the stock by the L. & N.

SHELBY & SHELBY, R. L. NORTHCUTT and WILLIS, TODD & BOND for appellant.

L. W. ROSS, P. J. BEARD for appellee.

Opinion of the Court by Judge Carroll—Affirming.

The appellee brought this suit against the appellant railroad company to recover damages for its negligent carriage of a car load of cattle delivered to it at Mt. Sterling, Ky., for shipment to Shelbyville, Ky.

The contract of shipment, among other things, provided "that the said shipper has delivered to the said carrier live stock of the kind and number and consigned and destined by said shipper as follows: Consignee, G. A. Peed; destination, Shelbyville, Ky.; for transportation from Mt. Sterling to destination if on the said carrier's line of railroad. Otherwise to the place where such live stock is to be received by the connecting carrier for transportation to or towards destination."

The trains, freight and passenger, of the appellant en route from Mt. Sterling and places East thereof to Louisville, Ky., the terminus of the road, pass through Shelbyville, and so did the train that took up the cars of cattle in question at Mt. Sterling on March 18th. It appears, however, that this car of cattle was carried by the appellant to Lexington, Ky., a point on its line of road between Mt. Sterling and Shelbyville, and there delivered to the Louisville & Nashville Railroad Co. for transportation to Shelbyville. The car containing the cattle left Mt. Sterling after six p. m. on the day it was loaded and arrived at Lexington on the same day at 8:20 p. m. About an hour afterwards the car with the cattle in good condition was delivered to the Louisville & Nashville and carried by that company to Louisville, and from thence to Shelbyville, arriving at the latter place at 8:20 a. m. on the 21st.

In ordinary course of transportation by the appellant, if the car had remained a part of the train in which it was put at Mt. Sterling it would have arrived at Shelbyville during the night of the 18th and within a few hours after leaving Mt. Sterling, but in the negligent delay in its transportation by the Louisville & Nashville the cattle did not reach Shelbyville until many hours after they should have been delivered there. The evidence shows that by the unreasonable delay in their carriage the cattle were damaged in the sum of $250, at which the jury assessed the recovery.

The trial court, in the course of the instructions, told the jury that "it was the duty of the Chesapeake & Ohio Railway Co. to carry plaintiff's stock on its own line of

railroad from Mt. Sterling to Lexington, and thence on the line of railroad of the Louisville & Nashville Railroad Co., operated by it from Lexington to Shelbyville by the way of Christiansburg, and within a reasonable time and without unreasonable delay." And the correctness of this portion of the instruction presents the only question in the case.

It is shown by the evidence that the trains of the Chesapeake & Ohio Railroad Co. run on its own line of railway to and from Lexington, Ky., and Mt. Sterling, Ky., and points east thereof, extending through the State of Kentucky to the West Virginia line. From Lexington, Ky., to Louisville, Ky., its trains are run over a line of the Louisville & Nashville Railroad Co. that goes by way of Shelbyville, thence to Louisville.

The trains of the Chesapeake & Ohio are run over the line of the Louisville & Nashville from Lexington to Louisville under a contract entered into between the two companies in March, 1895, that became effective in January, 1896, the Louisville & Nashville Railroad Co. being the party of the first part and the Chesapeake & Ohio being the party of the second part in the contract. By the terms of this contract it is continued in effect for one hundred years. In section five of the contract it is provided that:

"All business originating upon the line between Louisville & Lexington, not including business between either of said points to the other, shall belong exclusively to the first party, but the second party shall have the right to honor upon their trains passenger tickets of the first party for passengers to Frankfort and Shelbyville, and also any other points at which the trains of the second party may be obliged to stop on account of railroad crossings, train orders, water, etc., all of which tickets so honored shall, as soon as may be after the end of each month, be returned by the second party to the first party, and the first party shall thereupon pay the second party 25 per cent of the value of such tickets, and in the event of conductors of second party collecting cash fares to such points on the line used jointly (exclusive always of fares through from Louisville to Lexington and vice versa), second party shall in like manner at the end of each month report such cash fare collections to first party and remit to it 75 per cent thereof. The parties of the second part on their regular through trains may carry passengers to and from local points on the joint

tracks if such passengers be destined from or to their own lines, and for all such passengers they shall likewise pay party of the first part 75 per cent of the local fare.''

One of the contentions of counsel for the Chesapeake & Ohio is that this section of the contract prohibited the Chesapeake & Ohio from carrying this load of cattle in its own train from Mt. Sterling to Shelbyville and obliged it to transfer the car at Lexington to the Louisville & Nashville for carriage from there to Shelbyville. In support of this construction counsel say ''Section five, after providing that all business originating on the line between Lexington and Louisville shall belong to the Louisville & Nashville, contains an exception as to certain passenger business the Chesapeake & Ohio may do and provides how the revenue from that service may be divided, if it elects to perform it. The fact that it was necessary to insert this exception in order that appellant might do a passenger business at Frankfort and Shelbyville clearly shows that it was the intention of the parties to prohibit the appellant from doing any business on that line by the first part of that section, namely: 'All business originating upon the line shall belong exclusively to the first party,' else it would not have been necessary to insert that exception. There is no exception at all as to freight. The appellant is given the right to do no freight business between Lexington and Louisville. * * * The phrase 'all business originating' means simply that all revenue arising or earned on that line, except revenue on the other business, shall belong to the Louisville & Nashville, or that the handling of all traffic on that line, except the through business between Lexington and Louisville, shall be done by the Louisville & Nashville.''

In addition to this a number of other reasons are assigned why the Chesapeake & Ohio is and should be prohibited by the contract from doing any freight business between Lexington and Louisville either by delivering or receiving freight. It is further said that this court in Commonwealth v. Louisville & Nashville Railroad Co., 120 Ky., 91, adopted the construction here contended for and we are referred to the following excerpt from that opinion:

''The contract between the railroad companies prohibits the Chesapeake & Ohio Railway Co. from doing any local passenger or freight business from points be-

tween Lexington and Louisville; that is to say, by the terms of the contract the Chesapeake & Ohio Railway Co. acquired the right to run its through trains only over the road in question, and all business originating upon the lines between Lexington and Louisville, not including either of those points to the other, was to belong to the Louisville & Nashville Railroad Co. exclusively, except passenger fares from points where the Chesapeake & Ohio trains might be obliged to stop on account of railway crossings, train orders, water, etc., in which event that company was to receive 25 per cent of such fares and the Louisville & Nashville Railroad Co. 75 per cent thereof.''

We do not understand this extract from the opinion to hold that the Chesapeake & Ohio was prohibited by the contract from delivering at points between Lexington and Louisville freight received by it east of Lexington for shipment to these points. So much of the opinion as we have quoted only states in a general way the contents of clause five of the contract and was not intended to be a construction of that clause. This clause of the contract was not particularly involved in that case, and there was no reason why the court should have undertaken to construe it.

It may be conceded that the parties to this contract have given it the construction claimed by counsel, and in a controversy between the parties as to the proper interpretation of the contract this contemporaneous construction of the parties would undoubtedly be entitled to great weight. Nor do we doubt that the parties to this contract are at liberty, as between themselves, to interpret it as they please, so long as their interpretation does not affect the rights of the public.

But here we are dealing with a member of the public whose interests are affected by this contract and the construction given it by the parties is not controlling on him. The public is concerned in the construction of this contract as well as the parties to it, and no construction should unnecessarily be given to it that will interfere with the duties that these carriers and each of them owe to the public.

Railroad companies cannot enter into contracts with each other that will disable either of them from performing service to the public which except for the contract would be performed. They cannot enter into contracts with each other that will impair the ability of either of

them to furnish to the public such service as either of them might be required to and would furnish except for the contract. They are public agents and anything they do in connection with the operation of their trains and tracks must be done in such a manner as will conserve the public good. We, therefore, think that in the construction of contracts like the one in question where the rights of the public are concerned that construction should be adopted, if the contract is susceptible of it, that will be most favorable to the public. Or, to put it in another way, where the rights of the public are concerned, if the contract is open to two constructions, that construction will be adopted that will conform to the principles of law regulating common carriers in their dealings with the public.

Looking now to the contract, we think that although the parties may have construed it as prohibiting the Chesapeake & Ohio from delivering freight between Louisville and Lexington that was received by it east of Lexington, it is also open to the construction that it only prohibits the Chesapeake & Ohio from delivering freight between Louisville and Lexington that originated between these points or freight that it received between Louisville and Lexington, and does not prohibit it from delivering between these places freight that originated elsewhere on its lines. The ordinary, natural reading of the contract seems to convey this meaning. The words "all business originating upon the line between Louisville and Lexington, not including business between either of said points to the other, shall belong exclusively to the first party," appear to us according to their ordinary and natural meaning, to only reserve for the exclusive use of the Louisville & Nashville business originating between Louisville and Lexington.

This construction enables the Chesapeake & Ohio to perform without restraint the service it owes to persons who deliver to it freight at points east of Lexington for delivery at points on its line between Louisville and Lexington. The other construction interferes with its ability to perform this class of service and subjects shippers situated as appellee was to the delay, inconvenience and presumably additional expense of having freight that should be delivered by the Chesapeake & Ohio transferred by it to the Louisville & Nashville for delivery.

The facts of this case furnish a good example of the kind of delay, inconvenience and expense shippers from points east of Lexington to Shelbyville are subjected to if the Chesapeake & Ohio is required to transfer freight received east of Lexington for Shelbyville to the Louisville & Nashville at Lexington. In place of being carried direct from Mt. Sterling via Lexington to Shelbyville by the Chesapeake & Ohio and delivered there within a few hours after it left Mt. Sterling, the cattle were delivered at Lexington to the Louisville & Nashville. The main line of this road runs from Lexington to Louisville by way of Christiansburg, Eminence and Anchorage, not touching Shelbyville, but it has a branch line that leaves the main line at Christiansburg and goes from there to Shelbyville, thence to Anchorage, where it again intersects the main line, and it is over this branch line that the Chesapeake & Ohio runs its trains between Christiansburg and Anchorage. It appears in the evidence that the Louisville & Nashville, although it owns the branch line from Christiansburg to Louisville, runs its freight trains from Lexington to Louisville by way of Eminence, so that the car of cattle after being delivered to the Louisville & Nashville at Lexington was carried by it to Louisville and from there back to Shelbyville, making the haul from Lexington to Shelbyville about 130 miles, whereas it is only about 50 miles from Lexington to Shelbyville by way of Christiansburg.

It is manifestly unfair and unjust to shippers east of Lexington who wish to ship freight to Shelbyville to subject them to the delay and expense of this long and roundabout haul, and the conditions of which this case is an example furnish sufficient reasons why the contract, which is fairly susceptible of two constructions, should be so construed as to relieve shippers of this burden.

It may be argued that except for the contract the Chesapeake & Ohio could not run its trains over the tracks of the Louisville & Nashville between Lexington and Louisville, and, therefore, all freight received by it east of Lexington for points between Louisville and Lexington would necessarily have to be delivered to the Louisville & Nashville at Lexington, and, therefore, a contract requiring the Chesapeake & Ohio to do this does not leave shippers in any worse condition than they would be if there was no contract. We are not, how-

ever, concerned with what the conditions would be if
there was no contract, because there is a contract and
we must deal with conditions as they appear in the
light of this contract.

Thus construing the contract, the instruction given
by the court was clearly correct, because the contract of
shipment obliged the Chesapeake & Ohio to deliver the
cattle at place of destination "if on the said carrier's
line of railroad," and as Shelbyville was on the line of
railroad used and operated by it, of course it should have
delivered the cattle at destination in reasonable time.
If, however, the contract is not fairly susceptible of the
construction we have given it, and if it prohibits the
Chesapeake & Ohio from delivering freight received
east of Lexington at points on its road between Louis-
ville and Lexington, so much of it as contains this pro-
hibition is in violation of section 792 of the Kentucky
Statutes reading:

"When two railroad companies use the same line of
roadway in the operation of their trains, they shall af-
ford along such roadway reasonable and proper facili-
ties for the receiving, forwarding and delivering of
passengers and property without discrimination in their
rates and charges. All contracts made between such
companies, in so far as the same shall conflict with the
provisions of this section, are hereby declared to be null
and void, and contrary to public policy."

Giving to the contract the construction contended
for by counsel, it seems to us that as applied to the facts
of this case so much of it as prohibits the Chesapeake
& Ohio from delivering freight received east of Lexing-
ton to points on its line of road between Lexington and
Louisville plainly violates the provisions of this section
and is void.

In cannot be maintained that two railroad companies
using the same line of roadway in the operation of
their trains, are each affording reasonable and proper
facilities for the "receiving forwarding and delivering
of passengers and property without discrimination in
their rates and charges" when one of them is prohibited
by the contract from delivering freight at a point
through which its freight trains pass and is compelled
to transfer the freight to the other to be hauled by it
over another line of road and in a roundabout way to
the place of destination. It cannot be maintained that
this kind of traffic arrangement does not subject the

shippers to unreasonable and unnecessary delay, inconvenience and expense.

One of the purposes of this statute was to prevent the existence of conditions such as appear in this record, and the Louisville & Nashville could not, by imposing the conditions asserted, prohibit the Chesapeake & Ohio from furnishing the reasonable facilities its right to the use of the track enabled it to furnish. We do not of course mean to hold that this statute forbids railroad companies from entering into traffic arrangements with each other or from delivering freight to one another for carriage. It leaves railroad companies at liberty to make such traffic contracts with each other as they please, provided they do not obstruct the right of the public to reasonable and proper facilities for "receiving, forwarding and delivering passengers and property." For example, the Chesapeake & Ohio and the Louisville & Nashville might have a lawful traffic contract under which the Chesapeake & Ohio should deliver to the Louisville & Nashville at Lexington for delivery at local points between Lexington and Louisville freight received by the Chesapeake & Ohio east of Lexington, provided the freight when delivered to the Louisville & Nashville would be carried by it with the same expedition and the same expense as it would have been carried by the Chesapeake & Ohio.

But taking the facts of this case as an illustration of the manner in which this contract operates on the rights of the public, we find that it gave to the Louisville & Nashville the right to haul this load of cattle 80 miles further than they would have been hauled if carried by the Chesapeake & Ohio, and it is not to be presumed that the Louisville & Nashville carried this load this 80 miles without charging extra for it; or, in other words, without it costing the shipper more than he would have been required to pay if the cattle had been shipped direct from Mt. Sterling to Shelbyville. This practical construction given to the contract by these railroad companies demonstrates beyond question that so much of it as we have been considering is in violation of the statute, and, therefore, void as against public policy.

As the contract under which the Chesapeake & Ohio delivered these cattle to the Louisville & Nashville at Lexington was void, it affords no protection to the Chesapeake & Ohio, and this company is, therefore, lia-

ble for the negligence of the Louisville & Nashville as it is well settled that a carrier that wrongfully or unlawfully transfers or delivers freight to another that it should carry and deliver continues an insurer of the freight while it is in the hands of the other carriers. Hutchinson on Carriers, Vol. 2, Secs. 611-615.

Wherefore, the judgment is affirmed.